Slip Op. 23-139

## UNITED STATES COURT OF INTERNATIONAL TRADE

SECOND NATURE DESIGNS LTD.,

        Plaintiff,

    v.

UNITED STATES,

        Defendant.

Before: Gary S. Katzmann, Judge
Court No. 17-00271

## OPINION

[ Plaintiff's Motion for Summary Judgment is granted in part and denied in part.  Defendant's Cross-Motion for Summary Judgment is granted in part and denied in part. ]

Dated:  September 21, 2023

<u>John M. Peterson</u>, and <u>Patrick B. Klein</u>, Neville Peterson LLP, of New York, N.Y., argued for Plaintiff Second Nature Designs Ltd.

<u>Brandon A. Kennedy</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant United States.   With him on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Justin R. Miller</u>, Attorney-In-Charge.  Of counsel on the brief was <u>Alexandra Khrebtukova</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection of New York, N.Y.

    Katzmann, Judge:  Before the court are cross-motions for summary judgment.  Plaintiff

Second Nature Designs Ltd. ("Second Nature") contests the denial of protests challenging the

United States Customs and Border Protection's ("Customs") classification decision of imports

containing various decorative items of plant parts ("subject merchandise").  Customs classified the

subject merchandise under subheading 0604.90.60 of the Harmonized Tariff Schedule of the

United States ("HTSUS"),[1] carrying a duty rate of 7 percent <u>ad valorem</u>.  Second Nature argues

that the proper classification is subheading 0604.90.30, HTSUS, a duty-free provision.  Defendant

the United States ("the Government") contends that in addition to Customs's original classification

for certain categories of the subject merchandise, other headings of HTSUS provide the correct

classification for other categories.

    For the reasons established herein, the court agrees with Second Nature's preferred

classifications for certain categories of the subject merchandise involving dried items and curled

items.  For certain other categories, the court agrees with the Government's preferred classification

regarding certain styles of merchandise constituting artificial flowers or fruit.  The court further

finds that factual issues persist as to the remainder of the categories, precluding the grant of

summary judgment.  Accordingly, the court grants in part and denies in part both Plaintiff's Motion

for Summary Judgment and Defendant's Cross-Motion for Summary Judgment.

## BACKGROUND

    The court first sets out the overarching legal, factual, and procedural background necessary

to contextualize the various classification claims brought forth by Second Nature and the

Government.  The court will further develop such backgrounds as relevant and necessary in the

forthcoming discussion.

### I.    *Legal Background*

    The HTSUS governs the classification of merchandise imported into the United States.  <u>See</u>

<u>Wilton Indus., Inc. v. United States</u>, 741 F.3d 1263, 1266 (Fed. Cir. 2013).  The HTSUS sets out

the  tariff  rates  and  statistical  categories  using  a  series  of  nested  chapters,  headings,  and

---

[1] References to "chapter," "heading," or "subheading" herein refer to the relevant parts of the HTSUS.

subheadings.   In general, the HTSUS's primary headings describe broad categories of merchandise, while its subheadings provide a particularized division of the goods within each category.  The HTSUS "shall be considered to be statutory provisions of law for all purposes."  19 U.S.C. § 3004(c)(1).  Proper classification is governed by the General Rules of Interpretation ("GRIs") of the HTSUS as well as the Additional U.S. Rules of Interpretation.  See Roche Vitamins, Inc. v. United States, 772 F.3d 728, 730 (Fed. Cir. 2014) (citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)).

Judicial review of classification decisions involves two steps.  First, the court determines the proper meaning of the terms used in the HTSUS provision, which is a question of law.  See Link Snacks, Inc. v. United States, 742 F.3d 962, 965 (Fed. Cir. 2014) (citing Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005)).  Second, the court determines whether the subject merchandise falls within the description of those terms, which is a question of fact.  See id. (citing Orlando Food, 140 F.3d at 1439).  The key factual issue is the nature of the merchandise. See Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998) ("[S]ummary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is.").

The court applies the GRIs in numerical order beginning with GRI 1; the court will reach subsequent GRIs only if analysis under the preceding GRI does not yield proper classification of the subject merchandise.  See Link Snacks, 742 F.3d at 965; see also Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999).  "The HTSUS is designed so that most classification questions can be answered by GRI 1 . . . ."  Telebrands Corp. v. United States, 36 CIT 1231, 1235, 865 F. Supp. 2d 1277, 1280 (2012), aff'd, 522 F. App'x 915 (Fed. Cir. 2013).  Therefore, "a court first construes the language of the heading, and any section or chapter notes in question."  Orlando

Food, 140 F.3d at 1440.  Once imported merchandise is determined to be classifiable under a particular heading, a court must then look to the subheadings to find the correct classification of the merchandise in question.  Id.  Only after "exhausting the terms of the subheadings and related [chapter] notes would one turn to GRI 3 to choose between two or more potentially applicable subheadings."  Telebrands, 36 CIT at 1236, 865 F. Supp. 2d at 1281.

GRI 2 provides that the classification of "goods consisting of more than one material or substance" shall be determined according to the principles of GRI 3.  GRI 2, HTSUS.  Under GRI 3(a), goods are classified into "[t]he heading which provides the most specific description"; but if multiple headings "each refer to part only of the materials or substances contained in [a mixed good]," the headings are regarded as equally specific and the court moves to GRI 3(b) by classifying the good according to the material that gives the good its "essential character."  GRI 3, HTSUS.  If no essential character can be found, then the good is classified pursuant to GRI 3(c) "under the heading which occurs last in numerical order among those which equally merit consideration."  Id.  After using the GRIs to determine the correct heading, the court determines the correct HTSUS subheading using GRI 6, which directs that GRIs 1 through 5 be reapplied at the subheading level.  GRI 6, HTSUS.  "Only after determining that a product is classifiable under the heading should the court look to the subheadings to find the correct classification for the merchandise."  Orlando Food, 140 F.3d at 1440.

HTSUS terms are "construed according to their common and commercial meanings, which are presumed to be the same."  Carl Zeiss, 195 F.3d at 1379 (citing Simod Am. Corp. v. United States, 872 F.2d 1572, 1576 (Fed. Cir. 1989)).  The court defines HTSUS tariff terms by relying on its own understanding of the terms and "consult[ing] lexicographic and scientific authorities, dictionaries, and other reliable information sources."  Id. at 1379.  For additional direction on

construing HTSUS provisions, the court may also consult the Harmonized Commodity Description and Coding System's Explanatory Notes ("Explanatory Notes" or "ENs").  See StoreWALL, LLC v. United States, 644 F.3d 1358, 1363 (Fed. Cir. 2011).  Although the "Explanatory Notes are not legally binding," they "may be consulted for guidance and are generally indicative of the proper interpretation of a tariff provision."  Roche Vitamins, 772 F.3d at 731.

## II.  *Procedural Background*

From August 26, 2015, to November 13, 2015, Second Nature filed nine entries regarding the subject merchandise with the port of Detroit, Michigan.  Joint Rule 56.3 Stmt. of Material Facts as to Which There Are No Genuine Issues to Be Tried ¶ 2, Jan. 28, 2022, ECF No. 91-1 ("Joint SOF").  From July 9, 2015, to December 26, 2016, Second Nature filed 140 entries of the subject merchandise with the port of Buffalo, New York.  Id.  Customs classified the merchandise under subheading 0604.90.60, HTSUS, which covers: "Foliage, branches and other parts of plants, without flowers or flower buds, and grasses, mosses and lichens, being goods of a kind suitable for bouquets or for ornamental purposes, fresh, dried, dyed, bleached, impregnated or otherwise prepared: Other: Other."  Joint SOF ¶ 4.

Second Nature timely filed eleven protests between February 23, 2016, and June 29, 2017, with the Port Directors of Customs at the Port of Buffalo, New York, and the Port of Detroit, Michigan.  Compl. ¶ 11, Dec. 21, 2017, ECF No. 7; Am. Answer ¶ 11, Aug. 24, 2022, ECF No. 114.  These protests contested the classification, rate, and amount of duty assessed in liquidation, pursuant to 19 U.S.C. §1514(a)(2).[2]  Compl. ¶ 11; Am. Answer ¶ 11.  Specifically, Second Nature

---

[2] Goods imported into the customs territory of the United States must first be "entered," or in other words declared, to Customs.  Customs is then responsible for determining the final classification and valuation of the goods through a process called "liquidation of the entry."  19 U.S.C. § 1500 sets out the procedures for the liquidation process, which includes final appraisal, a final

argued that the entries should have instead been classified under subheading 0604.90.30, HTSUS, which covers: "Foliage, branches and other parts of plants, without flowers or flower buds, and grasses, mosses and lichens, being goods of a kind suitable for bouquets or for ornamental purposes, fresh, dried, dyed, bleached, impregnated or otherwise prepared: Other: dried or bleached."  Compl. ¶ 11; Am. Answer ¶ 11.

On May 8, 2017, Customs issued Headquarters Ruling Letter H279097, again confirming the 0604.90.60 classification for the further worked dried or bleached botanicals.  Joint Mot. at 5; Compl. ¶ 12; Am. Answer ¶ 12.  As support, Customs cited rulings where it had considered numerous other botanical products and found that dried natural goods which were decorated beyond bleaching or drying were classified under 0604.90.60.  Id.  Between May 19, 2017, and October 30, 2017, Customs denied certain protests underlying this action.  Compl. ¶ 13; Am. Answer ¶ 13.

Following the denial of its protests, Plaintiff timely filed suit on November 17, 2017, contesting Customs's classification and alleging that the goods are instead properly classified under subheading 0604.90.30, HTSUS.  See Summons, Nov. 17, 2017, ECF No. 1; Compl. at 4. The Government filed its Answer on April 12, 2018, defending Customs's classification under subheading 0604.90.60, HTSUS.  See Answer, Apr. 12, 2018, ECF No. 12.

The parties entered the discovery phase of the case.  Joint SOF at 3.  Discovery was slated to conclude on November 2, 2018.  Scheduling Order, May 25, 2018, ECF No. 17.  However,

---

classification decision, and liquidation, i.e., final ascertainment of duties.  After liquidation of the entry occurs, an importer may seek administrative review of a classification decision by protesting the decision to Customs, which results in an internal review of the decision by a higher level of authority within Customs.  If the importer is dissatisfied with the decision resulting from its protest, it may then, as here, seek judicial review.  See Amcor Flexibles Kreuzlingen AG v. United States, 46 CIT __, __, 560 F. Supp. 3d 1326, 1329–30 (2022).

following numerous motions for extension by the parties, discovery was ultimately extended until February 14, 2022—largely to accommodate the parties' joint efforts to establish the scope of the litigation and prepare an agreed-upon statement of facts.  See Order, Oct. 27, 2021, ECF No. 80; Joint Status Report at 1–3, Dec. 1, 2021, ECF No. 84 (discussing efforts to produce a joint statement of facts pursuant to Rule 56.3 of the U.S. Court of International Trade ("CIT")).

On January 28, 2022, shortly before the close of discovery, the parties jointly moved for an order implementing certain case management procedures, staying discovery, and dividing the proceedings into two phases.  See Joint Mot. for Entry of Order Providing Case Management Proc. & Dividing Remainder of Litigation into Two Phases, Jan. 28, 2022, ECF No. 91 ("Joint Mot." or "Joint Motion").  In the Joint SOF that was attached to the Joint Motion, the parties divided the merchandise into eight categories, from Category One to Category Eight.  See Joint SOF ¶¶ 6–41. The parties further stipulated that the parties sought only the court's determination as to the "appropriate methodology" for applying the GRIs in Category Seven, and that the parties would further resolve the proper classification through "briefing or by trial" as necessary.  Joint Mot. at 2.  The Parties further indicated that the Joint SOF would serve as the parties' joint statement of facts for the purposes of USCIT Rule 56.3.  See Joint SOF at 1.  The court granted the Joint Motion and partitioned the litigation into two phases, and the parties proceeded with the following motions for summary judgment as part of the first phase.  See Scheduling Order, Feb. 2, 2022, ECF No. 93 ("Feb. 2022 Scheduling Order").

On the same day the Joint Motion was filed, the Government filed a motion for leave to amend its Answer and assert a counterclaim that the subject merchandise is, in part, correctly classified under HTSUS 6702.90.65.  See Mot. to File an Am. Ans. & Suppl. Pleading Asserting a Counterclaim at 8–9, Jan. 28, 2022, ECF No. 92 ("Def.'s Am.").  Plaintiff responded in

opposition on February 18, 2022, see Pl.'s Resp. in Opp. to Def.'s Mot. to Am. at 2, Feb. 18, 2022,

ECF No. 95 ("Pl.'s Am. Resp."), and the Government replied on March 22, 2022, see Def.'s Reply

in Supp. of its Mot. to File an Am. Ans. & Suppl. Pleading Asserting a Counterclaim, Mar. 22,

2022, ECF No. 99 ("Def.'s Am. Reply").  On July 25, 2022, the court granted the Government's

motion for leave to amend and designated the proposed counterclaim as a defense.  See Second

Nature Designs Ltd. v. United States, 46 CIT __, __, 586 F. Supp. 3d 1334, 1342 (2022).

After the court's order granting the motion, the Government filed its Amended Answer on

August 24, 2022.  See Am. Answer.  In the Amended Answer, in addition to the alternative

classification under HTSUS 6702.90.65 that the Government originally sought to add in its

amendment, the Government included three more alternative classifications for certain items,

variously under HTSUS subheadings 4602.12.45, 4602.19.45, and 4602.19.80.  See id. ¶¶ 14, 17,

20, 23.  The additional alternative classifications under heading 4602 were not mentioned in the

Government's motion for leave to file an amended answer, nor in the Government's  subsequent

briefs for its motion to amend.  See Def.'s Mot. Am. Answer & Supp. Pleading, Jan. 28, 2022,

ECF No. 92-1; Def.'s Am. Reply.

Before the filing of the Amended Answer by the Government, on June 13, 2022, Second

Nature filed a Motion for Summary Judgment to classify all eight categories of the subject

merchandise under subheading 0604.90.30, HTSUS.  See Pl.'s Mot. for Summ. J. at 1, June 13,

2022, ECF No. 104 ("Pl.'s Mot."); Pl.'s Mot. for Summ. J. Mem. of Points & Auth. at 1, June 13,

2022, ECF No. 104-2 ("Pl.'s Br.").  The Government filed its Cross-Motion for Partial Summary

Judgment on September 30, 2022.  See Def.'s Resp. & Cross-Mot. for Partial Summ. J. Mem. of

Law, Sept. 30, 2022, ECF No. 115 ("Def.'s Br.").  Thereafter, Second Nature moved out of time

to file a reply brief, and the court granted the motion.  See Mot. Out of Time Leave to File Reply

Br., Dec. 14, 2022; ECF No. 118; Order, Dec. 15, 2022, ECF No. 119; Pl.'s Reply Br. in Supp. of
its Mot. for Summ. J., Dec. 15, 2022, ECF No. 120 ("Pl.'s Reply").  On January 10, 2023, the
parties jointly submitted fifteen physical exhibits as representative samples.  See Joint Cert. of
Filing & Serv. of Physical Exs., Jan. 10, 2023, ECF No. 121-1 ("Joint Cert. Exs.").   The
Government filed its reply brief.  See Def.'s Reply Br. in Supp. of its Cross-Mot. for Partial Summ.
J., Mar. 15, 2023, ECF No. 129 ("Def.'s Reply").

On June 8, 2023, the court issued questions to the parties in advance of oral argument.  See
Letter, June 8, 2023, ECF No. 133.  Second Nature and the Government filed written responses.
See Pl.'s Resp. to Ct.'s Qs. For Oral Arg., June 16, 2023, ECF No. 135 ("Pl.'s OAQ Resp."); Def.'s
Answers to Ct.'s Qs. for Oral Arg., June 16, 2023, ECF No. 134 ("Def.'s OAQ Resp.").   Oral
argument took place on Tuesday, June 20, 2023.  See Oral Arg., June 20, 2023, ECF No. 136.  The
court invited the parties to file submissions after oral argument, and Second Nature and the
Government made such submissions.  See Pl.'s Post-Arg. Subm., June 27, 2023, ECF No. 137
("Pl.'s Post-Arg. Br."); Def.'s Post-Arg. Subm., June 27, 2023, ECF No. 138.  The court later
issued supplemental questions to the parties, see Letter, June 30, 2023, ECF No. 139, and Second
Nature and the Government timely responded.  See Pl.'s Resp. to Ct.'s June 30, 2023 Letter, July
12, 2023, ECF No. 140 ("Pl.'s Supp. Q. Resp."); Def.'s Answers to Ct.'s Supp. Qs., July 12, 2023,
ECF No. 141 ("Def.'s Supp. Q. Resp.").

### III.     Factual Background

The parties have divided the subject merchandise into eight categories.  Unless otherwise
noted, the following facts are undisputed in the parties' joint statement and subsequent briefing:

In Category One, the subject product styles consist of foliage, branches, or other parts of
plants, without flower buds, or grasses, mosses, or lichens, that have glitter or another coating

applied to their exterior, and/or have been dyed.  Joint SOF ¶ 6.  The parties presented five styles

as representative of the merchandise within Category One: (1) Exhibit No. 1, "Item No. 00055,

Pinecones—Large Champagne Glitter—Consumer Pack"; (2) Exhibit No. 2, "Item No. 03379,

Lotus Pods White Wash—Bulk Pack"; (3) Exhibit No. 3, "Item No. 15731, Palm Reed

Mahogany—Value Pack"; (4) Exhibit No. 4, "Item 65536, Banana Stem White Wash, Value

Pack"; and (5) Exhibit No. 5, "Item No. 64649, Pinecones Large Snow Item."  Id. ¶¶ 7–11; Joint

Cert. Exs. at 1.

Category Two comprises two product styles.  Joint SOF ¶ 12.  The parties submit that the

styles of merchandise in Category Two are appropriately classified under HTSUS 0604.90.30.

Def.'s Br. at 6, 24; Pl.'s Reply at 11.

In Category Three, the subject product styles consist of thin flat strips of a plant of the

Calamus genus that are dried, dyed, and/or glittered, and shaped directly into decorative curls.

Joint SOF ¶ 15.  Exhibit No. 6, "Item No. 01694, Cane Spring Red Glitter—Bulk Pack" is the sole

representative style for this category.  Id. ¶ 16; Joint Cert. Exs. at 1.

In Category Four, the subject product styles consist of thin flat strips of colored willow

(genus Salix) plaited into the shape of a triangle and impaled on a stick.  Joint SOF ¶ 17.  "Item

No. 03322, Christmas Trees Gold Glitter—Consumer Pack" represents the characteristics of the

merchandise within this category.  Id. ¶ 18; Joint Cert. Exs. at 1.  Despite designating the item as

Exhibit No. 7, the parties did not submit a physical exhibit for Category Four because the

manufacturer has discontinued the representative product.  Joint Cert. Exs. at 1.

In Category Five, the subject product styles consist of thin flat strips of vegetable materials,

other than willow or wood, shaped directly into balls or other shapes, and some of which are also

impaled on sticks.  Joint SOF ¶ 19.  Exhibit No. 8, "Item No. 00210, Kambu Balls 8cm—Stemmed

Red Glitter—Consumer Pack" represents the characteristics of the merchandise within this category.  Id. ¶ 20; Joint Cert. Exs. at 1.

In Category Six, the subject product styles consist of articles that are handmade, using metal wire, tape, or glue to affix various dried plant materials into shapes resembling flowers or fruit.  Joint SOF ¶ 21.  Three styles represent the merchandise covered by Category Six: (1) Exhibit No. 9, "Item No. 16236, Deco Flowers Yellow—Value Pack"; (2) Exhibit No. 10, "Item No. 3229, Pumpkins—Stemmed Orange—Consumer Pack"; and (3) Exhibit No. 11, "Item No. 00696, Sola Berries Red Glitter—Consumer Pack."  Id. ¶ 22; Joint Cert. Exs. at 1.

In Category Seven, the subject product styles all contain more than one type of item.  Joint SOF ¶ 21.  The parties have agreed that the following six styles may serve as representative styles for the merchandise covered by Category Seven: (1) Exhibit No. 12, "Item No. 00182, Deck The Halls Champagne Glitter—Bouquet"; (2) Exhibit No. 13, "Item No. 57170, Trick or Treat—Bouquet"; (3) Exhibit No. 14, "Item No. 40180, Pumpkin/Root Ball Mix Orange—Jumbo Bag"; (4) Exhibit No. 15, "Item No. 03347, Panchu Bouquet"; and (5) Exhibit No. 16 "Item No. 50970, Fall Harvest Bunch Bouquet."  Id.; Joint Cert. Exs. at 2.  The parties indicated that "Item No. 51670, Root Ball Bouquet Item" was inadvertently included as a representative style, and further that "they intended to omit it from the Joint SOF."  Joint Cert. Exs. at 2; Joint SOF ¶ 21.

Category Eight contains 123 subject product styles, and the parties agree on the tariff classification of the imported merchandise under HTSUS subheadings 1401.10.00, 4602.19.60, 0604.90.10, 0604.90.30, and 3926.40.00.  Joint SOF ¶ 34.

## JURISDICTION AND STANDARD OF REVIEW

The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(a). The court may grant summary judgment when the movant shows that "there is no genuine issue

as to any material fact," and is thus "entitled to judgment as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>see also</u> USCIT R. 56(a).  "[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.    In other words, the inquiry is "<u>whether the evidence presents a sufficient disagreement</u> to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 251–52 (emphasis added).  The movant bears the burden of demonstrating that there exists no genuine issue of material fact that would warrant a trial.  <u>See, e.g.</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

"With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered." <u>Marriott Int'l Resorts, L.P. v. United States</u>, 586 F.3d 962, 968–69 (Fed. Cir. 2009) (citing <u>Mingus Constructors, Inc. v. United States,</u> 812 F.2d 1387, 1391 (Fed. Cir. 1987)).  "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other . . . ." <u>Mingus</u>, 812 F.2d at 1391. "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." <u>Id.</u>  "To the extent there is a genuine issue of material fact, both motions must be denied." <u>Marriott Int'l</u>, 586 F.3d at 969.

## DISCUSSION

Before the court, Second Nature asserts that (1) pursuant to GRI 1, the subject merchandise in Categories One, Three, Four, Five, Six, and Seven are properly classified as "dried or bleached" botanicals under the <u>eo nomine</u> provision[3] of HTSUS 0604.90.30; and (2) Note 2, Chapter 6 of the

---

[3] <u>See</u> <u>infra</u> pp. 13–14.

HTSUS governs classification for Category Seven.  The Government counters that (1) HTSUS 0604.90.30 is not an <u>eo nomine</u> provision, and that the basket provision of HTSUS 0604.90.60 is the correct classification for Category One; (2) Category Three is appropriately classified under HTSUS 4602.12.45 as other articles of rattan; (3) Category Four is appropriately classified under HTSUS 4602.19.45 as other articles of willow or wood; (4) Category Five is appropriately classified under HTSUS 4602.19.80 as other articles; (5) Category Six is appropriately classified under HTSUS 6702.90.65 as artificial flowers or fruit; and (6) Category Seven consists of composite items that require GRI 3 to be read together with Note 2, Chapter 6 of the HTSUS.  The court will address each argument in turn, focusing on specific categories at a time.

### I.   *HTSUS 0604.90.30 Is an <u>Eo Nomine</u> Provision as Between Subheadings Within Heading 0604*

#### A.   *Issue-Specific Legal Background*

##### 1.   *<u>Eo Nomine</u> Provisions*

In examining the subheadings, the court must first "assess whether the subject Headings constitute <u>eo nomine</u> or use provisions because different rules and analysis will apply depending upon the heading type."  <u>Schlumberger Tech. Corp. v. United States</u>, 845 F.3d 1158, 1164 (Fed. Cir. 2017).  An <u>eo nomine</u> provision "describes an article by a specific name," whereas a use provision describes articles according to their principal or actual use. <u>Id.</u>  An HTSUS provision is to be treated as <u>eo nomine</u> "when the interpretation [is] centered on the terms describing an article by a specific name."  <u>Schlumberger</u>, 845 F.3d at 1164 (citing <u>Sigma-Tau HealthScience, Inc. v. United States</u>, 838 F.3d 1272, 1278 (Fed. Cir. 2016)).  In other words, when the "operative question" is whether the merchandise in question qualifies as an item that is "expressly named and covered by [the] HTSUS heading," such HTSUS provisions can be treated as containing an <u>eo nomine</u> designation.  <u>Sigma-Tau</u>, 838 F.3d at 1278.  Subheadings, as well as headings, can

constitute <u>eo nomine</u> provisions.  <u>CamelBak Prods., LLC v. United States</u>, 649 F.3d 1361, 1364 (Fed. Cir. 2011).

"An <u>eo nomine</u> designation, with no terms of limitation, will ordinarily include all forms of the named article." <u>Irwin Indus. Tool Co. v. United States</u>, 920 F.3d 1356, 1360 (Fed. Cir. 2019) (quoting, ultimately, <u>Hayes-Sammons Chem. Co. v. United States</u>, 55 C.C.P.A. 69, 75 (1968)).  "<u>Stated otherwise, all forms, grades and qualities of the named article are embraced by such a designation</u>." <u>Hayes-Sammons</u>, 55 C.C.P.A. at 75 (citation omitted and emphasis in original).[4]

Thus, once a provision is found to be <u>eo nomine</u>, "an article which has been improved or amplified but whose essential characteristic is preserved or only incidentally altered is not excluded from an unlimited <u>eo nomine</u> statutory designation." <u>Casio, Inc. v. United States</u>, 73 F.3d 1095, 1098 (Fed. Cir. 1996).  The criterion is whether the item "possess[es] features <u>substantially in excess</u> of those within the common meaning of the term." <u>Id.</u> (emphasis in original) (citation omitted).  Factors such as design, use, or function may serve as "analytical tools or factors" in making this determination.  <u>CamelBak</u>, 649 F.3d at 1367.

---

[4] The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") adopted the case law of the Court of Customs and Patent Appeals ("CCPA") as binding precedent in its first ever en banc opinion, <u>South Corp. v. United States</u>, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc).  <u>See</u> <u>Deckers Corp. v. United States</u>, 752 F.3d 949, 964 (Fed. Cir. 2014).  "[T]he Court of Customs and Patent Appeals always sat [en] banc" and, therefore, the most recent decision of the CCPA controls as precedent over prior inconsistent decisions.  <u>Id.</u> (quoting <u>Celestaire, Inc. v. United States</u>, 120 F.3d 1232, 1235 (Fed. Cir. 1997)).  For classification issues, "the construction of a Customs classification provision by a panel of [the Federal Circuit] is binding upon both the Court of International Trade and subsequent panels of [the Federal Circuit] in later protest cases involving the same subheading or heading" "unless and until overruled by an intervening Supreme Court or en banc decision." <u>Id.</u> at 964, 966 (citing <u>Robert Bosch, LLC v. Pylon Mfg. Corp.</u>, 719 F.3d 1305, 1316 (Fed. Cir. 2013) (en banc)).

**2.      *Whether Reading Subheading Terms Together with the Terms of Superior Headings Can Constitute an <u>Eo Nomine</u> Designation under the HTSUS***

The key issue raised by Second Nature's argument is whether a subheading constituting only of adjectival terms, such as subheading 0604.90.30 ("[d]ried or bleached"), can be interpreted as an <u>eo nomine</u> provision when read together with the words of the superior heading, for the purpose of comparison with another eight-digit level subheading.  Second Nature argues that "while subheadings 0604.90.30 and 0604.90.60, HTSUS are not, in isolation, considered '<u>eo nomine</u>' provisions, when read in conjunction with the superior headings and subheadings, they do in fact describe a type of merchandise <u>eo nomine</u>[.]"  Pl.'s OAQ Resp at 1.  Thus, according to Second Nature, "[g]oods of subheading 0604.90 are differentiated according to whether they were subjected to certain forms of processing (drying or bleaching)."  <u>Id.</u>

To the contrary, the Government contends that subheading 0604.90.30 is not an <u>eo nomine</u> designation because the terms "dried or bleached" are "not a specific or well-known name for any commodity, but rather are a description of a particular way of processing or preparing the articles in question."  Def.'s Br. at 17.  In essence, the Government's argument is that because the subheading does not name anything, i.e., contain a noun describing a commercial name for a product or merchandise, the provision is not an <u>eo nomine</u> designation.  <u>Id.</u>; Def.'s Reply at 6–7; <u>see also</u> Def.'s OAQ Resp. at 3.

Although the parties have not directly supported their respective arguments with cases on point, a close reading of two cases cited in the briefs only for general propositions offers comparative context.  <u>See</u> Pl's Br. at 10 (citing <u>United States v. Bruckmann</u>, 65 C.C.P.A. 90, 582 F.2d 622 (1978)); Def.'s Br. at 9 (citing <u>Link Snacks, Inc. v. United States</u>, 742 F.3d 962, 965–66 (Fed. Cir. 2014)).  The first case, <u>Bruckmann</u>, was decided by the former CCPA and the second

case, <u>Link Snacks</u>, was decided by the Federal Circuit.  First, the holding in <u>Bruckmann</u> is that there is a general interpretive rule that a reference to "parts" in a superior heading will not travel down to a subheading if that subheading is an <u>eo nomine</u> provision.  <u>See</u> 65 C.C.P.A. at 95, 582 F.2d at 626 ("[T]he subheading argued by Bruckmann to be proper . . . is [n]ot adjectival in form . . . . That item is an [e]o nomine provision and, by the general rule, does not include parts.").

In <u>Link Snacks</u>, the Federal Circuit held that the subheading in HTSUS 1602.50.09,[5] containing only the adjectival phrase "[c]ured or pickled," is an <u>eo nomine</u> designation.  742 F.3d at 966 ("The subject beef jerky is described, <u>eo nomine</u>, by HTSUS 1602.50.09 as cured beef products.").[6]  The Federal Circuit further held that the <u>eo nomine</u> designation within subheading 1602.50.09 "does not draw distinctions based on whether or not the meat is dehydrated; the only inquiry is whether or not the meat has been cured."  <u>Link Snacks</u>, 742 F.3d at 966.  Therefore, "[a]lthough there is a respectable argument that the further step of dehydration affects the beef

---

[5] The relevant provisions of the HTSUS were as follows:

    1602    Other prepared or preserved meat, meat offal or blood:

    . . . . .
    1602.50        Of bovine animals
    1602.50.05            Offal
                    Other:
                          Not containing cereals or vegetables
    1602.50.09                 Cured or pickled
                        Other:
                            In airtight containers:
    1602.50.10                     Corned beef
    1602.50.20                 Other:

HTSUS (2006); <u>see also</u> <u>Link Snacks</u>, 742 F.3d at 966.

[6] The <u>Link Snacks</u> court therefore affirmed the CIT's holding that "the '[c]ured' subheading, 1602.50.09, is an <u>eo nomine</u> provision that 'include[s] all forms of the named article,' even improved forms."  <u>Link Snacks, Inc. v. United States</u>, 37 CIT 373, 378, 901 F. Supp. 2d 1369, 1375 (2013) (alterations in original) (citation and internal quotation marks omitted), <u>aff'd</u>, 742 F.3d 962.

jerky product beyond the curing process, it does not overcome the simple and straightforward classification of the subject merchandise as cured beef products." <u>Id.</u>  Thus, even a subheading such as 1602.50.09 containing only the adjectival terms "[c]ured or pickled" can constitute an <u>eo nomine</u> provision.  <u>Id.</u>

      **B.**      ***Subheading 0604.90.30 Is an <u>Eo Nomine</u> Provision for the Purposes of This Case***

The court now turns to the HTSUS provision in question.  Under the applicable HTSUS at the time of importation, heading 0604 and subheadings 0604.90.30 and 0604.90.60 were as follows:

> 0604   Foliage, branches and other parts of plants, without flowers or flower buds, and grasses, mosses and lichens, being goods of a kind suitable for bouquets or for ornamental purposes, <u>fresh, dried, dyed, bleached, impregnated or otherwise prepared</u>:
>
> | 0604.20.00 | Fresh | |
> |---|---|---|
> | . . . . . | | |
> | 0604.90 | Other: | |
> | 0604.90.10 | | Mosses and lichens |
> | | Other: | |
> | 0604.90.30 | | Dried or bleached |
> | 0604.90.60 | | Other |

HTSUS (2015) (emphasis added).  As of 2023, no significant changes have been implemented to the relevant provisions.  <u>See</u> HTSUS (2023).

While the court takes a "heading-specific approach," <u>Victoria's Secret Direct, LLC v. United States</u>, 769 F.3d 1102, 1110 (Fed. Cir. 2014), the opinions of the Federal Circuit and predecessor courts may provide several "analytical tools or factors" in interpreting other headings and subheadings under the HTSUS, <u>see</u> <u>CamelBak</u>, 649 F.3d at 1367 (examining, inter alia, case law pertaining to audio synthesizers in classification case of backpacks and other items). Examining the analytical tools employed by the two opinions in <u>Bruckmann</u> and <u>Link Snacks</u>, the court determines that HTSUS subheading 0604.90.30 is an <u>eo nomine</u> provision.  Unlike the

Bruckmann opinion, which interpreted the former Tariff Schedules of the United States, 65 C.C.P.A. at 94–95, 582 F.2d at 626, the case at bar, like Link Snacks, involves interpretation of a subheading within the HTSUS.  Also unlike Bruckmann, which involved the application of a specific rule of interpretation regarding a "parts" designation, this case involves general descriptors and raises the issue of whether such descriptors, names, or nouns may travel down, as was the case in Link Snacks.  Thus the court follows the Federal Circuit's approach in Link Snacks.[7]

As in the case of Link Snacks, a subheading consisting of only "descriptive terms" is to be read as an eo nomine provision when the operative question focuses on the terms describing an article.  See 742 F.3d at 966.  Just as a tariff subheading containing only the words "[c]ured or pickled" constitutes an eo nomine provision because the only relevant inquiry under that subheading is whether the product is "cured," the court determines that subheading 0604.90.30,

---

[7] Second Nature further argues that "classification provisions are either eo nomine or by use." Pl.'s Supp. Q. Resp. at 1.  In contrast, the Government only submits that it is not an eo nomine provision. See, e.g., Def.'s Supp. Q. Resp. at 1–2.  The Government does not address whether the provision is a use provision, or if there is indeed such a dichotomy under the HTSUS.  See id.; Def.'s Br; Def.'s Reply; Def.'s OAQ Resp.

Recent Federal Circuit opinions instruct the court to first "assess whether the subject Headings constitute eo nomine or use provisions." Schlumberger, 845 F.3d at 1164; see also Apple Inc. v. United States, 964 F.3d 1087, 1093 (Fed. Cir. 2020) ("There are two types of HTSUS headings, eo nomine [and] use provisions." (alteration in original)).  In determining whether a provision is eo nomine, the court must focus on the "operative question" of whether the merchandise "qualifies as . . . items that are expressly named and covered by [the relevant] HTSUS heading." Sigma-Tau, 838 F.3d at 1278; see also Schlumberger, 845 F.3d at 1164.  In other words, "when the interpretation center[s] on the terms describing an article," that provision is considered to be eo nomine. Schlumberger, 845 F.3d at 1164 (citing Sigma-Tau, 838 F.3d at 1278).

The language within subheading 0604.90.30, "dried or bleached," describes a condition of the merchandise.  It does not describe a use to which the product is dedicated.  As such, the key inquiry posed by the language of subheading 0604.90.30 is whether the item qualifies as such "dried or bleached" items.  Therefore, under the eo nomine–use dichotomy, the provision constitutes an eo nomine provision for the purposes of this case.

composed of the words "dried or bleached," constitutes an <u>eo nomine</u> provision for the purposes of this case.

## II.     *Category One Is Properly Classified Under Subheading 0604.90.30*

The court now turns to the classification of the products in Category One.  The Government argues that because the items are dyed or glittered or further decorated with artificial snow, they are not merely "dried or bleached" products as defined under subheading 0604.90.30.  Def.'s Br. at 20–21.  Accordingly, the Government contends that the basket provision of subheading 0604.90.60 is the only appropriate classification for the products at issue, as the provision best describing the merchandise in whole.  <u>Id.</u> at 21.  Further, the Government avers that even if subheading 0604.90.30 is an <u>eo nomine</u> designation, the items are transformed with features substantially in excess of those within the common meaning of the terms "dried" and "bleached." Def.'s OAQ Resp. at 3.  Second Nature responds that the <u>eo nomine</u> designation is applicable to improved products, and the additional processing such as coloring or glittering does not convert them into something else.  Pl.'s Reply at 6.

It is undisputed that all of the representative samples within Category One are "dried" products, Joint SOF ¶¶ 7–9, consisting of foliage, branches or other parts of plants, without flower buds, or grasses, mosses or lichens, that have glitter or another coating applied to their exterior, and/or have been dyed, <u>id.</u> ¶ 6.  However, it is also undisputed that the representative samples within Category One are not bleached: the word "bleached" does not appear in any of the samples' descriptions.  <u>See id.</u> ¶¶ 6–9.  Indeed, of the merchandise currently in dispute, only two styles within Category Seven contain such bleached components, <u>id.</u> ¶¶ 29, 32, with the remainder of bleached items found in Category Eight, <u>id.</u> ¶¶ 35, 40.

Following the approach of <u>Link Snacks</u>, the court determines that the subject merchandise is described, <u>eo nomine</u>, by subheading 0604.90.30 as "dried" foliage, branches, or other parts of

plants, without flower buds, or grasses, mosses or lichens.  The only inquiry of this eo nomine designation is whether or not the item has been dried.  The styles of Category One have all been dried.  Thus, any argument that the further processes of dyeing and glittering affect the product beyond the drying process fails to "overcome the simple and straightforward classification of the subject merchandise" as dried products.  Link Snacks, 742 F.3d at 966.

The Government's arguments to the contrary are unpersuasive.  First, the Government notes that dictionary definitions indicate that the common meaning of "bleach" is to remove color, Def.'s Mot. at 18, and thus the addition of dyes and glitter imparting a certain color to the merchandise may render the items substantially in excess of the common meaning of bleached goods.  However, as noted supra p. 19, the merchandise in Categories One through Six contain only items that were, and remain, dried.  Subheading 0604.90.30 was not defined as "dried and bleached."  The subsequent improvements to those items do not transform their dried characteristic, and thus do not remove the merchandise from the simple classification provided in subheading 0604.90.30.

Second, the Government raises a syntactic point on the use of the word "dyed" in the superior heading to argue that the "dried or bleached" subheading only covers items that have been merely dried, and not items that have been dried and further "dyed and/or bleached."  Def.'s Reply at 12; Def.'s OAQ Resp. at 5–6.  The Government's position is based on a definition of "fresh" as not dry, based on an exemplar sentence of fresh from the Collins Dictionary Online, and a definition from the Britannica Dictionary Online.  Def.'s Reply at 4–6; Def.'s OAQ Resp. at 6.  Based on this definition, the Government argues that subheading 0604.90, labeled "other" as opposed to "fresh," can only mean dried merchandise because fresh is "not dry" for the purposes of the term.  But this argument is not persuasive because the structure of the table and the offered

definitions do not necessitate such a reading.  Subheading 0604.90 could easily be read as "dried, dyed, bleached, impregnated, or otherwise prepared" by simple elimination,[8] and the dictionaries cited by the Government do not explicitly define "fresh" as not dry.  Likewise, the Government's argument as to description in whole and the need to resort to the basket provision is without merit.

Accordingly, the court determines that the merchandise identified in Category One is properly classified under subheading 0604.90.30.

### III.   Category Three Is Properly Classified Under Subheading 0604.90.30

The product styles in Category Three consist of thin flat strips of a plant of the Calamus genus that are dried, dyed, and/or glittered, and "shaped directly into decorative curls."  Joint SOF ¶ 15.  The parties present "Item No. 01694, Cane Spring Red Glitter—Bulk Pack" as a representative style for the merchandise covered by Category Three.  Id. ¶¶ 15–16.

The Government argues that in addition to heading 0604, these items are prima facie classifiable under heading 4602 as "other articles, made directly to shape from plaiting materials or made up from articles of heading 4601 . . . : Of vegetable materials: Of rattan: Other: Other," Def.'s Br. at 25 (internal quotation marks omitted), following the "relative specificity" rule of GRI 3(a).  Id. at 26–27.  The Government further argues that items curled into shape are covered by the "other articles, made directly to shape from plaiting materials" language within heading 4602.  Id. Thus, by the application of the relative specificity rule provided in GRI 3(a), the proper heading

---

[8] Under such a reading, it is possible to envision a type of merchandise such as "preserved grasses," undergoing a form of chemical treatment to retain moisture, and thus rendering such products, not fresh, not mosses or lichens, not dried or bleached, but "impregnated or otherwise prepared."  That reading would not render subheading 0604.90.60 "meaningless" as the Government suggests. Def.'s Reply at 4–6.  It may be true that drying is the most common form of preparation for botanical products, but based on the arguments and briefing, the court is not persuaded that the structure of the tariff provisions necessitates the conclusion that the word "Other" in Subheading 0604.90 can only be read as "dried."

should be 4602 according to the Government.  Id. at 25.

Second Nature submits that (1) the language of heading 4602 is limited by interpretive canons and that (2) the calamus strips are not plaiting materials constituting articles of Heading 4601, nor do the strips constitute "made up" articles.  Pl.'s Reply at 12–13.  Thus, according to Second Nature, only heading 0604 is prima facie applicable, and subheading 0604.90.30 remains the proper classification for the merchandise within this category.  Id.

Headings 4601 and 4602 read in relevant part:

> 4601   Plaits and similar products of plaiting materials, whether or not assembled into strips; plaiting materials, plaits and similar products of plaiting materials, bound together in parallel strands or woven, in sheet form, whether or not being finished articles (for example, mats, matting, screens):
> . . . . .
> 4602   Basketwork, wickerwork and other articles, made directly to shape from plaiting materials or made up from articles of heading 4601; articles of loofah:
>         Of vegetable materials:
> 4602.12        Of rattan:
> . . . . .
>                 Other:
> 4602.12.35           Wickerwork
> 4602.12.45           Other:

HTSUS, ch. 46 (2015).  As of 2023, no significant changes have been implemented to the relevant provisions.  See HTSUS (2023).  Note 1, Chapter 46 further defines "plaiting materials: as follows:

> In this chapter the expression "plaiting materials" means materials in a state or form suitable for plaiting, interlacing or similar processes; it includes straw, osier or willow, bamboos, rattans, rushes, reeds, strips of wood, strips of other vegetable material (for example, strips of bark, narrow leaves and raffia or other strips obtained from broad leaves), unspun natural textile fibers, monofilament and strip and the like of plastics and strips of paper, but not strips of leather or composition leather or of felt or nonwovens, human hair, horsehair, textile rovings or yarns, or monofilament and strip and the like of chapter 54.

Id., ch. 46 n.1.

### A.     The Relevant Language in HTSUS 4602 Is Ambiguous

The key question is whether the language of heading 4602 can cover items "shaped directly into decorative curls," or if it is limited to require that "other articles, made directly to shape from plaiting materials," be woven or interlaced.  Second Nature argues that the canon noscitur a sociis limits the range of permissible construction, and based on the dictionary definition of "basketwork" and "wickerwork," the other articles under heading 4602 should also be interpreted as requiring weaving or interlacing.  Pl.'s Reply at 13–14.  The Government argues that the language does not contain any such limitation or requirement pertaining to weaving or interlacing, and thus such requirements are unnecessary.  Def.'s OAQ Resp. at 7.

While canons of construction are certainly valuable tools of statutory interpretation, they are "no more than [a] rule[] of thumb."  Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 146 (2013) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992)).  The text is the "one, cardinal canon" a court must turn to "before all others."  Germain, 503 U.S. at 253; accord Robert A. Katzmann, Judging Statutes 29 (2014) ("When statutes are unambiguous . . . , the inquiry for a court generally ends with an examination of the words of the statute.").

Thus, the court first turns to the text of the statute to determine whether there is any ambiguity in the text of heading 4602 referring to "[b]asketwork, wickerwork, and other articles, made directly to shape from plaiting materials or made up from articles of heading 4601."  The Government argues that because the other articles are limited to those articles "made directly to shape from plaiting materials," and because the curled pieces of the calamus plant are such articles "made directly to shape," there is no ambiguity and the items are clearly defined as such.  Def.'s OAQ Resp. at 7.

The parties have not offered any clear definition of the term "other articles" or the phrases "made directly to shape."  The terms are undefined in the statute, and the chapter notes do not

provide further guidance.  The broad nature of the terms creates ambiguity as to whether it may

encompass items shaped into any form, such as curled sticks, or whether it requires some form of

weaving or interlacing.  Thus, the term is ambiguous as to the scope of merchandise covered within

the phrase "other articles, made directly to shape from plaiting materials."

### B.   Applying the Tools of Statutory Interpretation, the Meaning of "Other Articles, Made Directly to Shape" Requires Weaving or Interlacing

Resolving this ambiguity requires the court to first consider context imparted by other

related HTSUS provisions.  See Gerson Co. v. United States, 898 F.3d 1232, 1236–37 (Fed. Cir.

2018) ("[An HTSUS heading] does not exist in a vacuum, and we must read it in conjunction with

other relevant provisions to discern its meaning.").  The court "must read the words in their context

and with a view to their place in the overall statutory scheme."  BMW of N. Am. LLC v. United

States, 926 F.3d 1291, 1299 (Fed. Cir. 2019) (quoting King v. Burwell, 576 U.S. 473, 486 (2015)).

"Generally, the HTSUS is not designed so that the headings overlap; therefore, a GRI 1 analysis

should be a searching one."  Metchem, Inc. v. United States, 30 CIT 902, 905, 441 F. Supp. 2d.

1269, 1272 (2006), aff'd, 513 F.3d 1342 (Fed. Cir. 2008).

First, considering the context of the headings, the Government's suggested reading of

heading 4602 is overbroad.  The Government argues that because the merchandise is "shaped

directly into decorative curls," it aligns with the language of heading 4602, and thus according to

the Government two headings are prima facie applicable.  However, such a reading that curled

items are "other articles, made directly to shape" for the purposes of heading 4602 necessarily

implies that any shaped item whatsoever would be classified under heading 4602 as long as that

item is made of plaiting materials. Def.'s Br. at 28 (citing HTSUS, ch. 46 n.1).  Plaiting materials

include not only "strips of other vegetable material" but also "unspun natural textile fibers,

monofilament and strip and the like of plastics and strips of paper."  HTSUS, ch. 46 n.1.  Such a

broad interpretation would lead to an anomalous result with respect to the scope of not just headings 0604 and 4602, but also several other headings within the HTSUS involving textiles, plastics, and paper.

Further, the Explanatory Notes to Chapter 46 provide guidance on the interpretation of the terms within Heading 4602.   "After consulting the headings and section or chapter notes, [the court] may also consult the World Customs Organization's Explanatory Notes, which accompany each chapter of the HTSUS."   Gerson, 898 F.3d at 1237 (quoting Otter Prods., LLC v. United States, 834 F.3d 1369, 1375 (Fed. Cir. 2016)).   "Although not binding, where a tariff term is ambiguous the Explanatory Notes may provide persuasive and clearly relevant guidance to the meaning of the term."   Id. (emphasis added) (quoting StoreWALL, LLC, 644 F.3d at 1363).[9]

The general EN to Chapter 46 provides that:

> In addition to articles of loofah, this Chapter covers semi-manufactured products (heading 46.01) and certain articles (headings 46.01 and 46.02) made by interlacing, weaving or by similar methods of assembling unspun materials . . . .

As described in the EN, the chapter is intended to include certain semi-manufactured products and certain articles made by interlacing, weaving, or similar method of assembling unspun materials. Considering this language in the EN, the court finds that Government's suggested reading of "other articles, made directly to shape from plaiting materials" is overinclusive.   Heading 4602 is formulated in a way that captures items of basketwork, wickerwork, and other articles involving methods such as interlacing, weaving, or other similar methods.   To hold that curled items would

_____

[9] Second Nature argues with regard to Category Seven that it is improper to import a limitation from the ENs, citing Midwest of Cannon Falls Inc. v. United States, 122 F.3d 1423, 1428 (Fed. Cir. 1997).   However, as noted in Gerson, the tariff provisions in Midwest were unambiguous. Gerson, 898 F.3d at 1238.   As such, the holding in Midwest that the EN's limitations cannot be used to narrow a clear, unambiguous expression of legislative intent is inapposite here, when the tariff provision in question "is ambiguous standing alone."   See id. (emphasis in original).

be prima facie classifiable under this heading would lead to an anomalous application of the HTSUS.

### IV.    *Genuine Issues of Material Fact Preclude Summary Judgment as to Categories Four and Five*

In a tariff classification dispute, summary judgment is appropriate only when "there is no genuine dispute as to the nature of the merchandise and the classification determination turns on the proper meaning and scope of the relevant tariff provisions." Deckers Outdoor Corp. v. United States, 714 F.3d 1363, 1371 (Fed. Cir. 2013).  A genuine issue of material fact regarding "the salient physical characteristics" of the merchandise, id., or regarding "exactly what the merchandise is," id. (quoting Bausch & Lomb, 148 F.3d at 1365), precludes a grant of summary judgment.  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998).  In ascertaining whether a genuine issue of material fact exists, a court draws all inferences against the moving party in reviewing the submitted evidence.  See Matsushita Elecs. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Moreover, on cross-motions for summary judgment in tariff classification cases, "each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Plexus Corp. v. United States, 44 CIT __, __, 489 F. Supp. 3d 1379, 1388 (2020) (quoting, ultimately, Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997)).

Unlike their arguments regarding the merchandise in Category Three, the parties do not dispute that the styles in Category Four and Category Five are "plaited." See Joint SOF ¶¶ 17–20;

Pl.'s Reply at 14, 17; Def.'s Reply at 18, 20–21.[10]  Thus Second Nature's arguments as to <u>noscitur</u> <u>a sociis</u> and the requirement of weaving and interlacing are inapposite here.[11]

For Category Four, Second Nature maintains that the proper classification for Category Four items is subheading 4602.19.35 as items of wickerwork, as opposed to the Government's preferred classification of subheading 4602.19.45.  Likewise, for Category Five, Second Nature submits that subheading 4602.19.60 is the proper classification for Category Five items, as opposed to the Government's preferred classification of subheading 4602.19.80.  In both cases, the key issue is whether the items qualify as wickerwork.

The Government argues that the common meaning of wickerwork requires that the items be made of "vegetable twigs and rods, in contrast to strips, filaments, etc.," with twigs and rods consistently held in Customs's practice as having "a <u>generally</u> cylindrical shape" and "rounded cross-sections."  Def.'s Br. at 30 n.12, 34 n.14, 38 n.16 (emphasis added).  According to the Government, because the parties do not dispute that the items in Categories Four and Five are made of "thin flat strips," Joint SOF ¶¶ 17–20, the items are made of strips and filaments and cannot be classified as wickerwork.  In contrast, Second Nature argues that the products at issue consist of "twigs, osiers or the like plaited together," Pl.'s Reply at 16 (citation omitted), and that

---

[10] Second Nature originally submitted that the items in Category Five are "not plaited—that is they are not braided."  Pl.'s Br. at 18 (internal quotation marks omitted); Pl.'s OAQ Resp. at 8. However, Second Nature later clarified its position as follows: "Plaintiff's argument is not that the material is <u>not plaited</u>, but rather, the shapes of these products not qualify for classification in Heading 4602, HTSUS . . . ."  Pl.'s Post-Arg. Br. at 2 (emphasis in original).

[11] By Second Nature's own preferred definition, plaiting is defined as "the <u>interlacing</u> of strands: BRAIDING."  <u>See</u> Pl.'s Br. at 17 (first emphasis added).  Second Nature argues, without supporting authority, that the term "other articles made directly to shape" requires the article to have a certain intricate weaving and interlacing, or a form of "braiding" found in ordinary basketwork or wickerwork.  Pl.'s Post-Arg. Br. at 2.  The court finds this argument unpersuasive based on the text of the HTSUS, and further declines to require such a level of intricacy that has not been clearly presented or defined.

the common meaning of "wickerwork" does not require the items to be cylindrical, id.

Assuming arguendo that Government's definition of the common meaning applies, that would only require the twigs and rods to be "<u>generally</u>" cylindrical or with rounded cross-sections. It does not require that the components be completely round.  Further, in reviewing the submitted evidence, the court finds that there is a genuine issue of material fact as to the salient physical characteristic of the merchandise: whether the items within Category Four and Category Five are composed of twigs and the like, or whether they are made of strips, filaments, and the like.

The Government avers that the description and photographs in the Joint SOF "clearly show that the article <u>is</u> made directly to shape from plaiting materials" because the articles are made of thin flat strips.  Def.'s Reply at 17.  However, Exhibit No. 8, <u>supra</u> p. 10, appears at odds with this statement.  <u>See</u> <u>Simod Am. Corp.</u>, 872 F.2d at 1578 ("[T]he merchandise itself is often a potent witness in classification cases.").  A factfinder considering the exhibit may reasonably conclude either that the items are made from twigs of a generally cylindrical shape, or that the cross-sections are rounded.

The Government also argues that Second Nature's position on the so-called "lata star" item, which the parties have agreed to classify under subheading 4602.19.60 as wickerwork in Category Eight, is inconsistent with its position that the styles of Categories Four and Five are not properly classified under heading 4602.  <u>See, e.g.</u>, Def.'s Reply at 17; Def.'s OAQ Resp. at 9–10.  The lata star is an item made of a dogbane plant of the Apocynum genus, which is a vegetable material other than willow or wood, with a round cross-section, plaited into the shape of a star and impaled on a wooden stick.  Joint SOF ¶¶ 27, 36.  Per the Government, the lata star's "physical composition and description closely resemble those of the styles of Categories Three, Four, and Five."  Def.'s Reply at 17.  But examining the physical sample of the "lata star" component alongside the "kambu

ball," which is a representative sample of Category Five composed of the same vegetable material as the "lata star," the court concludes that the two items are not sufficiently similar to foreclose Second Nature's arguments here.   A factfinder may reasonably discern a difference in the roundedness of the items' cross-sections and may reasonably conclude that the kambu ball is composed of either "twigs" of wickerwork or "strips."[12]

Thus, evaluating each party's motion on its own merits, and drawing all reasonable inferences against the party whose motion is under consideration, the court finds genuine issues of material fact remain as to each motion.   Again, "the judge's function" at the summary judgment stage "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Ford Motor Co., 157 F.3d at 854.   To grant Second Nature's motion, the court would need to weigh the evidence, including the Joint SOF's description of the item as consisting of "thin flat strips" and find as a matter of fact that the products at issue consist of "twigs, osiers or the like plaited together." Likewise, to grant Government's motion, the court would need to weigh the evidence, including the physical exhibits such as the lata star, and find as a matter of fact that the products at issue indeed are composed of "thin flat strips."   The court's function at this stage is not to determine the truth of these factual contentions one way or another, especially when the dispute involves the genuine issue of material fact regarding "exactly what the merchandise is." Deckers Outdoor, 714

---

[12] As noted by the predecessor court in International Fashions v. United States, when an article's relevant characteristics are not apparent from a layperson's visual examination of an exhibit, it is the movant's responsibility to "adduce testimonial evidence from persons familiar" with the merchandise.   78 Cust. Ct. 153, 155 (1977).   In essence, the parties here seek a factual determination of whether the pieces of willow or dogbane plant may constitute materials of wickerwork or other materials, based on statements and conflicting evidence alone, without presenting the court with such expert testimony or other relevant evidence.   The court may not make such factual determinations at the summary judgment stage based on the record before it.

F.3d at 1371.  Thus, summary judgment for either party on this issue is improper at this stage of

the litigation.[13]

### V.      Category Six Is Properly Classified Under Subheading 6702.90.65

Regarding the items in Category Six, the Government proposes an alternative classification

under subheading 6702.90.65 as artificial flowers or fruit.  Second Nature argues that the common

meaning of "artificial flower" can only refer to flowers composed of man-made materials, and not

natural materials such as parts of plants that have been dried and bleached.  Pl.'s Br. at 19; Pl.'s

OAQ Resp. at 9–10.  Further, Second Nature argues that the two representative samples of artificial

fruit do not resemble the actual fruit because of the difference in size and because they are placed

on a stick.  The court finds Second Nature's arguments unpersuasive and concludes that the

Government's classification is correct.

### A.      Artificial Flowers Need Not Be Composed Solely of Non-Natural Materials

With the first contention, the court again begins with the text of the headings and relevant

chapter notes.  Pointing to dictionary definitions and several decisions of the predecessor court,

Second Nature argues that the plain meaning of "artificial flowers" encompasses only articles

made from "artificial" materials.  Pl.'s OAQ Resp. at 9–10; Pl.'s Reply at 19–21.

As a preliminary matter, the definitions offered by Second Nature do not support its

synecdochic proposition that the materials comprising an artificial flower must themselves be

---

[13] Especially in a case such as this, where the parties have filed cross-motions for summary judgment, supported only by a joint statement of facts and certain physical exhibits, the grant of summary judgment requires caution.  See 10A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2720 (4th ed. 2023) ("[A] party may argue that no issue exists in the hope that his legal theory will be accepted . . . .").  In any event, "[t]o the extent there is a genuine issue of material fact, both motions must be denied."  Marriott Int'l, 586 F.3d at 969.

artificial to warrant "artificial" classification for the whole.[14]  Further, as noted by the Government during oral argument, subheading 6702.90.10 lists "feathers," by no means exclusively a man-made item, as a possible material for artificial flowers.[15]

The cases of the predecessor court also support this conclusion.  As Second Nature itself notes, the predecessor court held under the former tariff provision that artificial flowers can be made using dried plant parts.  Pl.'s Reply at 21 (citing Terra Firma Sales Corp. v. United States, 84 Cust. Ct. 54, 55 (1980)).  In Terra Firma, the merchandise at issue consisted of parts of dried plants which had been glued together to form a flower and then attached to a wrapped wire stem.  84 Cust. Ct at 55.  The importer argued that artificial flowers must be composed of artificial substances, and the predecessor court held as follows:

> [I]n the opinion of the court, the artificiality of artificial flowers resides in the manner of their creation and not in the synthetic nature of their components.  An artificial flower is a flower whose body was not created by nature, and it matters not whether it is made from bits and pieces of natural plants. . . . There is no ambiguity in the term artificial flowers and no reason to refer to legislative history.  In any event, plaintiff's references reveal only that the fabrication of artificial flowers from parts of natural plants was not one of the princip[al] concerns of the legislators.  There is no indication that such products were not to be considered artificial.

---

[14] Neither one of Second Nature's dictionary definitions of "artificial" support its argument.  Pl.'s OAQ Resp. at 9.  First, the Merriam-Webster Online Dictionary defines "artificial" as "humanly contrived, often on a natural model."  Artificial, Merriam-Webster, https://www.merriam-webster.com/dictionary/artificial (last updated Sept. 11, 2023).  Under that definition, an "artificial flower" would be a humanly-contrived flower, often on a natural model.  Likewise, the Britannica Dictionary defines "artificial" as "not natural or real; made, produced or done to seem like something natural."  Artificial, Britannica Dictionary, https://www.britannica.com/dictionary/artificial (last visited Sept. 11, 2023).  Using the second definition, the term "artificial flower" is a flower that is not natural or real, or a flower that is made, produced, or done to seem like something natural.  But neither definition is so narrow as to suggest that all of the component parts of an artificial flower must also be humanly contrived or man-made.

[15] Also instructive is the wording of Note 3(b), Chapter 67, HTSUS, which excludes "artificial flowers, foliage or fruit of . . . wood or other materials, obtained in one piece . . ."  The fact that such artificial flowers of wood, a naturally occurring ingredient, were explicitly excluded suggests that the common meaning of artificial flowers would generally encompass such materials.

Id. (emphasis added).

Further, in Cochran Co. v. United States, an early leading case, one of the articles at issue was "a cluster of black straw wound into the form of berries or grapes and set on a black-straw leaf attached to a stem of black straw and metal." 10 Ct. Cust. 62, 64 (1920); see also Marshall Field & Co v. United States, 45 C.C.P.A. 72, 76 (1958) (describing background to Cochran). The Cochran court held that such items were classifiable as artificial fruit, notwithstanding the fact that they are made of straw, a natural material. 10 Ct. Cust. at 64. It reasoned that:

> It may be that neither exhibit truly represents any natural flower, fruit, leaf, or stem. Nevertheless, both come within the tariff designation of "artificial and ornamental fruits, grains, leaves, flowers, and stems," inasmuch as they are articles which simulate the natural fruit, flower, leaf, or stem in its physical characteristics and appearance sufficiently <u>to cause them in common understanding to be regarded as leaves, stems, flowers, or fruits produced not by nature, but by the hand of man</u>, and which at the same time are appropriate and suitable to be used for those purposes of ornamentation to which the natural products may be temporarily devoted.

Id. (emphasis added). The court finds these opinions to be instructive for the case at bar. Ultimately, the common meaning of "artificial flowers" cannot be read as requiring that the articles consist solely of man-made materials.

## B. The Merchandise Falls Within the Common Meaning of Artificial Flowers or Fruit

The court turns to Second Nature's second contention, which is that certain articles at issue would not be considered a flower or fruit based solely on their physical characteristics and appearance. Pl.'s Reply at 21. Second Nature does not raise this argument regarding the "Item No. 16236, Deco Flowers Yellow—Value Pack" sample, and agrees that it may resemble a flower in appearance. Pl.'s OAQ Resp. at 9. Second Nature makes distinctions only as to Exhibit No. 10, "Item No. 3229, Pumpkins—Stemmed Orange—Consumer Pack"; and Exhibit No. 11, "Item

No. 00696, Sola Berries Red Glitter—Consumer Pack." Pl.'s Reply at 21; Joint SOF ¶ 22; Joint

Cert. Exs. at 1.  Second Nature's arguments are unpersuasive.

Second Nature contends that "when dried plant parts are fashioned into a [two-inch] wide

miniature structure resembling a pumpkin, and placed on a stick," the resulting article is not an

"artificial fruit" because "it would not be regarded as a fruit."  Pl.'s Reply at 21.  Likewise, Second

Nature argues that when dried plant parts are shaped into the form of berries and placed on a stick,

the resulting article would not be considered to be artificial berries because "berries are not

mounted on a stick."  Id.

Whether Second Nature takes issue with the disparity in size between the samples and real

fruit or the fact that both samples are mounted on a stick, see Pl.'s OAQ Resp. at 10–11, neither

distinction is compelling.  In both appearance and size, the relevant representative samples, Exhibit

No. 10, "Item No. 3229, Pumpkins—Stemmed Orange—Consumer Pack" and Exhibit No. 11,

"Item No. 00696, Sola Berries Red Glitter—Consumer Pack," may reasonably be regarded as

artificial fruit in common understanding.[16]  Further, even if the articles are mounted on a stick,

---

[16] In United States v. Dieckerhoff, Raffloer & Co., the Court of Customs Appeals held that wax
pieces about the size of a small hickory nut, resembling in shape and color of various fruits and
vegetables, are significantly different in terms of size and thus not considered artificial flowers.  4
Ct. Cust. 384, 385 (1913).  That case is inapposite here, where Second Nature has not established
such a significant difference in size.  The fact that the samples are only two inches wide does not
necessarily create a significant disparity with natural products of pumpkin, especially when
considering that pumpkins used for decoration are often miniature varieties of a similar size.  The
berries in the sample are also not significantly different in size from natural berries.

Further, as noted in Cochran, there is no requirement that the merchandise must accurately
represent an actual plant.  10 Ct. Cust. at 64 ("It may be that neither exhibit truly represents any
natural flower, fruit, leaf, or stem.  Nevertheless, both come within the tariff designation . . . .").
The relevant inquiry is whether a man-made article "looks enough like a flower (real or imaginary)
to be regarded as an artificial flower [or fruit] 'in common understanding.'"  Marshall Field, 45
C.C.P.A. at 80 (emphasis omitted) (quoting Cochran, 10 Ct. Cust. at 64).

they would still fall under HTSUS heading 6702, which encompasses "articles made of artificial flowers, foliage or fruit."

Accordingly, the court determines that the merchandise within Category Six, as represented by the samples, are classified prima facie under heading 6702, HTSUS. The court further determines that subheading 6702.90.65 is the proper subheading for classification of the merchandise.

### VI.    *Genuine Issues of Material Fact Preclude Summary Judgment as to Category Seven*

#### A.    *The GRIs Are Applied in Numerical Order*

The Government argues that even if the subject merchandise within this category are properly described in Heading 0604, the bouquets and mixtures also contain items described under other headings, and thus the court must apply GRI 3(b) for the composite goods. In the Government's words, "Note 2 to Chapter 6 must be read together with GRI 3," Def.'s Reply at 26 (emphasis in original). The problem with this argument is that it relies on GRI 3(b) analysis of composite goods when analysis under GRI 1 is not exhausted.

A basic tenet of HTSUS classification is that the GRIs operate in a hierarchy. See Otter Prods., 834 F.3d at 1375 ("We apply the GRIs in numerical order . . . ."). As noted above, because the HTSUS is not designed so that the headings overlap, the GRI 1 analysis should be searching. Metchem, 30 CIT at 905, 441 F. Supp. 2d at 1272. The court does not reach GRI 3 unless it is satisfied that more than one heading may cover the article. Orlando Food, 140 F.3d at 1440.

GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS (2015) (emphasis added). "We apply GRI 1 as a substantive rule of interpretation, such that when an imported article is described in whole by a single classification heading or subheading, then that single classification

applies, and the succeeding GRIs are inoperative." <u>Rubies Costume Co. v. United States</u>, 922 F.3d

1337, 1342 (Fed. Cir. 2019) (citation omitted).   "The Chapter Notes are an integral part of the

HTSUS, and have the same legal force as the text of the headings." <u>Roche Vitamins</u>, 772 F.3d at

731; <u>see also</u> <u>Libas, Ltd. v. United States</u>, 193 F.3d 1361, 1364 (Fed. Cir. 1999) (treating Note 4

to Chapter 52 as having the same weight as statutory language).   Therefore, "a court first construes

the language of the heading, and any section or chapter notes in question." <u>Orlando Food</u>, 140

F.3d at 1440.   Once imported merchandise is determined to be classifiable under a particular

heading, a court must then look to the subheadings to find the correct classification of the

merchandise in question.   <u>Id.</u>   Only after "exhausting the terms of the subheadings and related

[chapter] notes would one turn to GRI 3." <u>Telebrands</u>, 36 CIT at 1236, 865 F. Supp. 2d at 1281.[17]

Thus, the Government's argument that "Note 2 to Chapter 6 <u>must be read together with</u>

<u>GRI 3</u>," Def.'s Reply at 26 (emphasis in original), is unpersuasive.   That argument runs counter to

the well-recognized rule that the GRIs apply in numerical order; the interpretation of chapter notes

is paramount when evaluating classification under GRI 1.   Only after exhausting GRI 1 can the

court turn to subsequent GRIs.   <u>Id.</u>; <u>see also</u> <u>Lemans Corp. v. United States</u>, 660 F.3d 1311, 1316

---

[17] As the <u>Telebrands</u> court described in detail:

> What is clear from the legislative history . . . and case law is that <u>GRI 1 is</u>
> <u>paramount</u>.   [GRI 1] provides in relevant part, "classification shall be determined
> according to the terms of the headings and any relative Section or <u>Chapter Notes</u>."
> . . . The Explanatory Notes to GRI 1 state that "<u>the terms</u> of the headings and <u>any</u>
> <u>relative Section or Chapter Notes are paramount</u>, i.e., they are the first consideration
> in determining classification" and the GRIs are to be considered in numerical order.
> <u>The headings and relevant notes are to be exhausted before inquiries, such as those</u>
> <u>of GRI 3, are considered</u>, e.g., specificity or essential character.   The HTSUS is
> designed so that most classification questions can be answered by GRI 1, so that
> there would be no need to delve into the less precise inquiries presented by GRI 3.

36 CIT at 1235, 865 F. Supp. 2d at 1280 (emphasis added) (citations and footnotes omitted).

(Fed. Cir. 2011) ("GRI 1 requires classification according to the terms of the headings and any relative section or chapter notes.  If GRI 1 resolves the issue, the court is not to look to other GRIs." (internal citation and quotation marks omitted)).

### B.   Genuine Issues of Material Fact Remain as to the Nature of the Merchandise

The Government's other argument is that Note 2 to Chapter 6 cannot resolve the classification issue because of the nature of the merchandise.  Thus the Government implies that application of GRI 1 does not solve the issue, necessitating application of the subsequent GRIs.  In the Government's words, "Note 2 does not obviate the need for an essential character analysis under GRI 3(b) for composite styles, when such bouquets consist in part of components that, if imported separately, would be classified under different tariff provisions."  Def.'s Br. at 50 (emphasis added).  The Government contends that because the goods all contain components that the parties agree would be classified under different tariff provisions, id. at 44, and further because those components are not mere accessories, the merchandise falls outside the scope of the chapter note, id. at 51; Def.'s Reply at 27–28.

Second Nature counters that Note 2, Chapter 6 resolves the classification issue.  According to Second Nature, "[o]nce it is determined that a bouquet contains a part of a plant specified in heading 0604, HTSUS, and that said plant part is dried or bleached, the bouquet is classified under subheading 0604.90.30, HTSUS, [and] resort to GRI 3 is precluded."  Pl.'s Reply at 23.  Second Nature further argues that if a bouquet contained items falling within two or more subheadings within headings 0603 or 0604, HTSUS, a GRI 3 analysis may be necessary, but that this is not the situation at bar since Second Nature's bouquets "contain only dried or bleached plant parts of subheading 0604.90.30."  Id. at 23 n.16.  Thus, according to Second Nature, "mixtures in the form

of bouquets, floral baskets, wreaths and similar articles, containing any of the goods of heading 0603 or 0604, HTSUS, are classifiable in those headings." Id. at 22.

> Note 2, Chapter 6 of the HTSUS provides in relevant part:
>
> Any reference in heading 0603 or 0604 to goods of any kind shall be construed as including a reference to bouquets, floral baskets, wreaths and similar articles made wholly or partly of goods of that kind, account not being taken of accessories of other materials. However, these headings do not apply to collages or similar decorative plaques of heading 9701.

HTSUS, ch. 6 n.2 (emphasis added).

Clearly, the parties dispute a material fact, which is the physical characteristics of the bouquets. See, e.g., Pl.'s Supp. Q. Resp. at 2; Def.'s Supp. Q. Resp. at 2. Despite the parties' representations otherwise, the record shows pronounced disagreement on the question of whether (1) the items are bouquets and similar articles containing only dried or bleached plant parts of subheading 0604.90.30, or (2) the items are prima facie classifiable under a different heading and thus fall outside the scope of the text allowing "accessories" to be disregarded. As noted by the Government, the parties indicated that at least two of the styles contain items that, if individually imported, would be properly classified in subheading 4602.19.60, HTSUS. Def.'s Br. at 46, 48; Joint SOF ¶¶ 28, 31. That classification contrasts with Second Nature's statement that the bouquets "contain only dried or bleached plant parts of subheading 0604.90.30." Pl.'s Reply at 23 n.16; see also Pl.'s Supp. Q. Resp. at 2 (stating that Second Nature does not agree with the Government's characterization).

Further, in response to the Government's arguments that Note 2 may not be read in an overbroad manner, Second Nature argues that the note limits its scope "to bouquets, floral baskets, wreaths and similar articles," and disregards "accessories." Pl.'s OAQ Resp. at 3. But the focus of Second Nature's arguments has been on the bouquet products. See, e.g., Pl.'s OAQ Resp. at 12

("Note 2 to Chapter 6 specifically governs the classification of bouquets of Heading 0604 . . . ."); Pl.'s Post-Arg. Br. at 3.  Second Nature does not address how "Item No. 40180, Pumpkin / Root Ball Mix Orange—Jumbo Bag," an item that the parties agree is "representative" of the merchandise within this category, Joint SOF ¶¶ 26, 30, can be properly characterized as "bouquets, floral baskets, wreaths and similar articles" that contain "only dried or bleached plant parts of subheading 0604.90.30."[18]   Further, Second Nature does not address how this item factually supports its legal argument "that when two or more products <u>covered by the same tariff provision are imported together</u>, they do not constitute a 'mixture.'"  Pl.'s Post-Arg. Br. at 4 (emphasis added); <u>see also</u> Pl.'s Supp. Q. Resp. at 2.  Thus Second Nature, as movant, has not established the absence of a genuine issue of material fact, and summary judgment is improper at this stage.  <u>See</u> <u>Anderson</u>, 477 U.S. at 247; USCIT R. 56(a).

Likewise, the Government's contention that all the merchandise within this category contains at least one item that is indisputably classified in a heading other than heading 0604 also leads to a genuine issue of material fact.[19]  Indeed, the Government suggests that it does not know

---

[18]  By the parties' submission of uncontroverted fact, that style consists of ball-shaped items, two-thirds of which consist of "root balls" properly classified under subheading 4602.19.60 if individually imported.  <u>Id.</u> ¶¶ 30, 31.  The other components are the artificial pumpkins discussed <u>supra</u> p. 11, with the added fact that they are not stemmed.  <u>Id.</u> ¶ 30.  A factfinder inspecting the physical sample as represented in Exhibit No. 14, <u>supra</u> p. 11, may reasonably conclude that these items are simply placed together in a vinyl bag.  <u>See</u> <u>Trans-Atlantic Co. v. United States</u>, 60 C.C.P.A. 100, 102–03, 471 F.2d 1397, 1398 (1973) ("[T]he sample of the imported merchandise . . . is itself a potent witness . . . ."); <u>see also</u> Joint SOF ¶ 30; Joint Cert. Ex. at 2; Exhibit No. 14. Second Nature does not adequately address why this style, representative of the merchandise within Category Seven, fits its description of "all or most of the items in a bouquet [that], if individually imported, would be classified under the same HTS item, 0604.90.30."  Pl.'s Post-Arg. Br. at 4.

[19] Not only is the Government's factual claim missing from the formal Joint SOF, but it is also in contention with the samples that the parties provided.  Specifically, a factfinder may reasonably conclude that "Item No. 03347, Panchu Bouquet," does not contain at least one item classified outside of Heading 0604, and the Government has failed to identify such an item on the record

the actual components of the goods in this category and argues that further discovery is necessary

to determine their components.  Def.'s OAQ Resp. at 8.  The court concludes, therefore, that the

Government, as cross-movant, has also not demonstrated an absence of a genuine dispute of

material fact.  See Anderson, 477 U.S. at 247 (1986); USCIT R. 56(a).

The parties here dispute a genuine issue of material fact regarding the salient physical

characteristics of the individual components constituting Category Seven items.  See Deckers

Outdoor, 714 F.3d at 1371They dispute whether the merchandise comprises only items properly

classified under heading 0604, or whether certain items may fall under a different heading.  This

dispute, in turn, implicates additional genuine issues of material fact about whether those items

can be characterized as accessories to the primary article, and what the primary article is.[20]  The

"salient physical characteristics" of the subject merchandise have thus not been established by

undisputed facts, Deckers Outdoor, 714 F.3d at 1371, and this action may not be resolved on

summary judgment.

Again, "[t]he fact that both parties have moved for summary judgment does not mean that

the court must grant judgment as a matter of law for one side or the other . . . ."  Mingus, 812 F.2d

at 1391.  "Rather, the court must evaluate each party's motion on its own merits, taking care in

_____

before the court at summary judgment.  Joint SOF ¶ 32; Def.'s Supp. Q. Resp. at 2.  Instead, the
Government now claims that this item should be categorized in Category Eight.  Def.'s Supp. Q.
Resp. at 2–3.

[20] In essence, Second Nature asks the court to categorically determine that all merchandise within
Category Seven may be properly classified under subheading 0604.90.30, Pl.'s Br. at 19–21, by
focusing on specific samples without explaining why the "Pumpkin/Root Ball Mix Orange—
Jumbo Bag," a sample representing the style of several items within Category Seven, is adequately
covered by the text of Note 2, Chapter 6.  Likewise, the Government asks the court to categorically
determine that all merchandise within Category Seven must be resolved under GRI 3, without
establishing the factual basis for that claim, i.e., that at least one component of each item in
Category Seven is classifiable under a heading other than heading 0604.

each instance to draw all reasonable inferences against the party whose motion is under consideration." Id.  "To the extent there is a genuine issue of material fact, both motions must be denied." Marriott Int'l, 586 F.3d at 969.  Accordingly, both motions are denied with respect to the classification of the items described in Category Seven at this stage of the litigation.

## CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED** that Second Nature's Motion for Summary Judgment is **GRANTED** as to the merchandise identified in Categories One and Three, which are classified under HTSUS subheading 0604.90.30; and it is further

**ORDERED** that the Government's Cross-Motion for Summary Judgment is **GRANTED** as to the merchandise identified in Category Six, which is classified under HTSUS subheading 6702.90.65; and it is further

**ORDERED** that the parties' classification of the merchandise identified in Category Two under HTSUS subheading 0604.90.30, see Def.'s Br. at 6, 24; Pl.'s Reply at 11, and in Category Eight under HTSUS subheadings 1401.10.00, 4602.19.60, 0604.90.10, 0604.90.30, and 3926.40.00, see Joint SOF ¶¶ 34–41, is hereby adopted by the court; and it is further

**ORDERED** that, insofar as the motions do not pertain to the merchandise identified in Categories One, Two, Three, Six, and Eight, Second Nature's Motion for Summary Judgment and the Government's Cross-Motion for Summary Judgment are **DENIED**; and it is further

**ORDERED** that, within fourteen days of this order, the parties will file a joint status report and a proposed scheduling order governing the second phase of the litigation.  See Feb. 2022 Scheduling Order at 2.  The proposed scheduling order should provide for any discovery, including

written discovery and depositions, that may be necessary for classifying the merchandise identified

in Categories Four, Five, and Seven.

        **SO ORDERED.**

                                                             */s/    Gary S. Katzmann*
                                                             Gary S. Katzmann, Judge

Dated: September 21, 2023
         New York, New York